## WALTERS v. MUTUAL LIFE INS. CO. OF NEW YORK.
### No. 3434.

Circuit Court of Appeals, Fourth Circuit.
April 4, 1933.

J. H. Bridgers, of Henderson, N. C. (Pittman, Bridgers & Hicks, of Henderson, N. C., on the brief), for appellant.

James H. Pou, of Raleigh, N. C. (James H. Pou, Jr., and J. L. Emanuel, both of Raleigh, N. C., and Frederick L. Allen, of New York City, on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is a suit instituted in the District Court of the United States for the Eastern District of North Carolina, by the appellee (who will here be referred to as plaintiff) in June, 1931, against the appellant (here referred to as defendant) for the purpose of correcting certain errors in two stamped indorsements upon a life insurance policy issued by said company upon the life of one Simpson G. Walters, No. 2,754,184, for $5,-000; for adjudication of the amount for which said company was liable under said policy (the administratrix asserting that she was entitled to receive the full sum of $5,000 with interest, and the company contending that it was liable only for the sum of $1,236 with interest); and for a complete settlement and adjustment of all controversy between the parties concerning said policy.

The defendant filed answer, setting out the policy and the death of insured; denying that errors had been made in the indorsements on said policy; and insisting that the company was indebted to her on account of said policy in the sum of $5,000 with interest, upon the ground that she had the right to elect to treat the policy as an "Extended Term" policy.

After hearing, the judge below made his findings of fact and conclusions of law, and entered a decree in favor of the plaintiff from which action this appeal was brought.

There is little or no dispute as to the facts. The policy in question was issued by the plaintiff company on May 26, 1920, and was for the sum of $5,000 upon the life of Simpson G. Walters, payable to his estate and the premiums on said policy were paid until May 26, 1929. Upon request of the insured under a condition in the policy, the time for payment of the premium due May 26, 1929, was extended to November 26, 1929, but the premium was never paid. This extension agreement created a lien on the cash surrender value of the policy for the payment of the premium due May 26, 1929.

The insured was adjudicated insane on November 2, 1929, and admitted to the State Hospital for the Insane on January 18, 1930. His wife took the policy to the local agent of the plaintiff, who, on February 1, 1930, wrote the company inclosing the policy with the statement that the insured was ill and could not be examined looking to a reinstatement of the policy. No notice was given to the company of the insanity of the insured. In reply to this letter of its agent the company's manager wrote saying that under the provisions of the policy it had been automatically continued by the company at the expiration of the extension date, as paid-up, nonparticipating life insurance in the sum of $1,318.

On March 11, 1930, Mrs. Walters wrote the company as follows: "I am writing in regards to policy #2754184 on the life of my husband, Simpson G. Walters. I was unable to continue payments on the policy and I took the matter up with the agent here. I wanted the cash value of the policy and through a misunderstanding on my part or

her part I received a paid-up policy for $1,-318. Kindly let me hear from you at once as to what can be done. Write me direct as I think it will cause a clearer understanding."

On May 12, 1930, the wife of the insured was duly appointed guardian of his person and estate and qualified as such. On or about August 1, 1930, the insured, having been released by the superintendent of the State Hospital, returned to his home. The certificate of the superintendent under which the insured was released reads as follows: "This is to certify that S. G. Walters, an insane person, was sent to this Hospital from Vance County, and that his being at large would not, in my opinion, be injurious to himself or dangerous to the community, and I recommended that he be sent to said county on probation."

After the return of the insured to his home he undertook work of various kinds and remained actively at work until his death, which was sudden and unexpected, on December 31, 1930.

There was evidence to the effect that he was not normal, mentally, during the period of his release from the hospital and at his death.

On August 26, 1930, the manager of the plaintiff's office at Charlotte, N. C., wrote the insured that under the conditions of the policy it had been automatically converted into a paid-up nonparticipating policy in the sum of $1,236; the former calculation of $1,318.00 admittedly having been erroneous. In response to this letter the insured returned the policy to the company on September 2, 1930, with the following letter: "As per your request I am enclosing policy No. 2754184 to be endorsed for paid up ins. for the amt. of $1,236.00. Am sorry I could not carry on the premiums. Please endorse and return same to me."

Owing to a clerical error an erroneous indorsement reinstating the policy was stamped thereon, but after, on October 29, 1930, a stamped indorsement was made on the policy showing it to be continued as a paid-up endowment policy for $1,236.

After insured sent in his policy for correction of indorsement on September 2, 1930, so as to show that the policy had automatically gone into effect as paid-up endowment insurance for $1,236, and while his wife was acting as his guardian, insured told her what he had done. The wife made no objection to insured or to the company. She did not notify the company, or its agent, that insured had been adjudged insane and committed to the State Hospital, and that she was his lawful guardian. She did not inform the company of her husband's mental condition; nor did she express any desire, or make any request, that the policy be converted into extended term insurance.

The pertinent parts of the policy in question are as follows:

"After three full years' premium shall have been duly paid, and provided there is no premium more than three months in default, the owner may elect one of the following options:

"(a) to surrender this policy for its cash value less any indebtedness to the Company hereon (this balance is herein referred to as the net cash value); or,

"(b) to surrender this policy for paid-up non-participating term insurance dating from the date of such default for an amount equal to the face amount of this policy and any outstanding dividend additions less any indebtedness to the Company hereon; in addition to such term insurance, if the value be more than sufficient to purchase term insurance to the automatic surrender date, there will be granted paid-up non-participating pure endowment payable on the expiry of the term insurance, if the Insured be then living, as hereinafter set forth; or,

"(c) to have the insurance continued as paid-up non-participating endowment insurance payable on the automatic surrender date if the Insured be then living or upon receipt of due proof of the prior death of the Insured and on the same conditions as this policy, the reduced amount payable being the same whether the policy mature by survival or death. * * *

"In the event of default in payment of premium, if this policy shall not, within three months after such default, have been surrendered to the Company at its Home Office for its cash value as provided in option (a), or for continued insurance as provided in option (b), the insurance will automatically become paid-up endowment insurance as provided in option (c). * * *

"8th. That if said premium with interest thereon be not paid within the period of extension, said indebtedness shall be deducted from the amount which would have been applicable as a surrender value at the due date of the premium had no such extension been granted, and the balance of the surrender value, if any, may be drawn in cash, or may be applied as the owner may elect, either to

the purchase of continued insurance (which will be less in amount and of less duration than if there were no extension) or to the purchase of paid-up insurance (which will be less in amount than if there were no extension), in accordance with the clause in the policy entitled 'Options on Surrender or Lapse.' If no such election be made such balance shall be automatically applied as provided in the policy."

"9th. That the period within which the policy grants the right to elect one of the 'Options on Surrender or Lapse', is not extended except that in no case shall such right cease before the expiration of the term of extension granted for the payment of premium. * * * *"

It is contended on behalf of appellant that because the insured was adjudged insane shortly before the expiration of the six months' extension period and because he made no request for change in the plan of settlement stipulated in the policy that on the death of the insured the defendant, his administratrix, is entitled to have the most favorable of the settlements named in the policy, selected by the court for the benefit of the insured's estate. That although neither the insured nor his wife, as his guardian, had exercised any of the options mentioned in the policy, within the time stipulated, the fact that the insured was insane relieved him of the necessity of exercising any option as required by the policy. We cannot agree with this contention.

There is a conflict in the decisions as to whether the insanity of an insured releases him from the automatic provision of an insurance policy and the attorney for appellant relies upon a line of cases holding to the effect that such a condition does relieve. In the case of Rhyne v. Insurance Company, 196 N. C. 717, 147 S. E. 6, the court held that insanity would relieve the insured from complying with a stipulation in the policy requiring notice of disability. See, also, Rhyne v. Insurance Company, 199 N. C. 419, 154 S. E. 749; Nelson v. Insurance Company, 199 N. C. 443, 154 S. E. 752; Swann v. Atlantic Insurance Company, 156 Va. 852, 159 S. E. 192; Pfeiffer, Administrator, v. Ins. Co., 174 Ark. 783, 297 S. W. 847, 54 A. L. R. 600.

In Tyson v. Equitable Life Ins. Co., 144 Ga. 729, 87 S. E. 1055, the Supreme Court of Georgia takes the opposite view, and Couch on Insurance, vol. 3, p. 2081, citing the Georgia case, says: "Nor does the fact that Insured became insane during the election period, extend such period, or change the rule that the option must be exercised within a designated period. And, where the option for extended insurance after default is conditioned upon the good health of the Insured, his administrator cannot exercise the option, although the Insured died within a year from default, where insanity prevented personal exercise of the option."

In the instant case there was no condition in the policy as to notice with respect to the option that the appellee claims went into effect. The provision became effective automatically if (for any cause) no election was made by the insured.

In 37 Corpus Juris, p. 446, it is said. "Under the terms of some policies, an option of Insured to surrender the policy and take a paid-up term policy can be exercised only during the life time of Insured; it cannot be exercised after the expiration of the time specified, notwithstanding the insanity of Insured during that time."

In the Rhyne Case, 199 N. C. 420, 154 S. E. 749, 750, this conflict of authority is recognized by the Supreme Court of North Carolina, when it says: "It is conceded that the decisions upon the proposition as to how far the insanity of the insured will excuse failure to furnish proof of disability, are not uniform and have been built upon divergent theories of liability, thus working out variable conclusions of law."

The cases relied upon on behalf of appellant are predicated upon policies different from the one here and upon a different state of facts, but even were they controlling in the states where they were decided they are not controlling in the federal courts where insurance contracts will be construed in accordance with the general commercial law, as enforced by those courts, independently of state decisions. This has been the uniform holding of this court. Fountain & Herrington v. Mutual Life Ins. Co. (C. C. A.) 55 F.(2d) 120; Curtis v. Prudential Ins. Co. (C. C. A.) 55 F.(2d) 97; Pilot L. Ins. Co. v. Owen (C. C. A.) 31 F.(2d) 862.

In his finding of fact the judge below held that: "From August 1, 1930, until his death on December 31, 1930, intestate had sufficient mental capacity to know what he was doing, and was actively engaged in said businesses."

Giving to the finding of the judge who heard the witnesses that weight to which it is entitled (The Corapeake (C. C. A.) 55 F. (2d) 228), we are compelled to the conclusion that even had the insured been relieved

182

of the necessity of exercising his options under the policy during the time he was insane, he yet had ample time before his death to avail himself of any rights he had under the policy. Yet we find that on September 2, 1930, he wrote the company acquiescing in their action in indorsing the policy as paid-up for the amount of $1,236. Under the holding of the trial judge as to insured's mental capacity, which there was substantial evidence to support, he was bound by this action.

Neither the insured, while he was attending to business and corresponding with the company in what was apparently a sane and reasonable way, nor his wife, while she was corresponding with the company in regard to the policy in question, looking to securing the cash surrender value, gave the company any notice of insured's insanity, nor was any such notice given during the period when the wife was acting as guardian for the insured. Even if it be supposed that the insured, by reason of the adjudication of insanity, must be considered as insane from the time of his adjudication until his death, this did not relieve the guardian of his estate of the obligation to act in his behalf; so that whether the insured be considered sane or insane during the period, there was a failure to exercise one of the options given in the policy, and the automatic provision became effective.

In order to show the fallacy of defendant's position we have only to consider the situation were the contentions made on behalf of the defendant allowed to prevail. Knowing that the time in which to exercise an option had expired and knowing that the company had acted under the automatic provision of the policy, and having corresponded with the company with regard to this action, the wife could stand silent until either the death of the insured or until his continued life made the paid-up insurance option the more favorable one and then decide which one she would choose. This certainly would not accord with the principles of equity or justice. The duty devolved upon either the insured while sane, or the wife as his guardian while insured was insane, to take some action within a reasonable time. The decision as to what course to pursue cannot in all equity, be allowed to be delayed until the death of the insured.

Insurance contracts should be and are as sacred and binding as any contracts made in the course of other commercial business, and in the absence of any ambiguity the plain and ordinary meaning of simple words should be given effect. It seems reasonable to presume that the automatic provision is inserted in this and like policies to cover the very situation that here arose. As was said by Mr. Justice Sutherland in Bergholm v. Peoria Life Insurance Company, 284 U. S. 489, 52 S. Ct. 230, 231, 76 L. Ed. 416:

"It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. Mutual Life Ins. Co. v. Hurni Co., 263 U. S. 167, 174, 44 S. Ct. 90, 68 L. Ed. 235, 31 A. L. R. 102; Stipcich v. Insurance Co., 277 U. S. 311, 322, 48 S. Ct. 512, 72 L. Ed. 895. This canon of construction is both reasonable and just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings.

"Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense. * * *

"And to discharge the insured from the legal consequences of a failure to comply with an explicitly stipulated requirement of the policy, constituting a condition precedent to the granting of such relief by the insurer, would be to vary the plain terms of a contract in utter disregard of long-settled principles."

We are of the opinion that the case was properly decided by the learned judge below, and the decree is accordingly affirmed.