GUARDIAN LIFE INSURANCE COMPANY OF AMERICA *v.* WATERS.

4-6923                              167 S. W. 2d 886

Opinion delivered January 18, 1943.

88

*Howard Cockrill* and *Bernal Seamster,* for appellant.

*C. D. Atkinson* and *Chas. W. Atkinson,* for appellee.

GRIFFIN SMITH, C. J. We determine whether there was substantial evidence to sustain the trial court's finding that appellee should recover on a $2,000 policy of insurance executed December 30, 1911, on the life of appellee's husband, who died November 6, 1939.

From 1926, when an initial loan of $500 was made, miscellaneous borrowings by the assured, plus interest and premiums (less dividends and $19.88 paid by the assured) left the assured's net obligation $1,086.83. There is a stipulation to that effect. The loan agreement of June 1, 1933, for $1,014.15 at five percent interest, is an exhibit. In case of default, interest was to be added to the loan, and in turn it bore interest at the principal rate.

There was the agreement that upon default in the payment of any premium, " . . . the policy [shall] lapse and this loan, with accrued interest, if any, shall be deducted from the cash surrender value and the balance shall be applied as provided for in said policy." The table shows $990.20 as the maximum loan

value, the policy being a "twenty-year pay"—that is, premiums were not collectible after twenty annual payments had been made. Printed beneath the table there appears the following: "Values for later years will be computed on the same basis and will be stated upon request."

A policy provision is that if the assured, before attaining age sixty, should furnish proof satisfactory to the company that he had become wholly and permanently disabled, then, by indorsement on the policy, premiums would be waived.

In the original suit filed August 1, 1940, appellee alleged payments of all premiums as they fell due. There was the assertion that on December 30, 1931, the policy became fully paid. Loans, it was conceded, amounted to $1,177.30, leaving a balance of $822.70, for which judgment was asked. In explanation of non-possession of the policy, the plaintiff expressed a belief it had been delivered to the company as security.

Defendant's answer itemized seven loans aggregating the balance of $1,086.83 heretofore referred to, and as justification for the declination to settle, it alleged that the assured failed to pay either principal or interest. There was the averment that all dividends to which the assured was entitled had been credited; that when interest due December 30, 1936, was not paid notice was mailed conveying the information that unless a remittance was received within the grace period of one month cancellation of the policy would result, and this would be in satisfaction of the loan, there being no additional cash surrender value.

Appellee's reply to the answer, filed August 28, 1940, was coupled with an allegation that the assured " . . . became and was mentally incompetent to transact business prior to June 12, 1933, [and continued so] until the date of his death."

Appellant's demurrer of December 4, 1940, was overruled; whereupon answer was filed.

These pleadings are mentioned because they were not included in the original record, but were brought

up in consequence of appellant's petition for *certiorari*. It was resisted on the ground that an amended and substituted complaint was filed. The date is not shown. However, summons is indorsed as of August 1, 1940.

We think appellant had a right to bring up the entire record, and the clerk's writ was properly issued.

. . . .

When appellee married the assured he was employed by a Kansas City lumber company as bill clerk.[1] Bertha L. Springer[2] testified the assured was employed eighteen years by the company mentioned by appellee. After appellee married the assured he at first gradually became nervous. This attitude was accentuated as time went on. Substance of appellee's testimony, when read in connection with the testimony of Dr. C. P. Cisco, was that the assured died from cancer of the intestines or liver. Hemorrhage was the immediate cause of death. In June, prior to her husband's death in November of the same year, appellee ascertained why he was subject to bleeding attacks.

According to appellee, her husband "tried to do many things" after he lost his position with the lumber company, but was unable to work. They came to Arkansas to operate a chicken ranch, but after two years it was sold, no profits having been realized. Appellee taught school in 1928 and 1929.

In 1929 appellee's husband returned to Kansas City and secured employment with a lumber company other than the one with which he had formerly been connected. The position lasted until August, 1930— slightly more than a year. His duties were similar to the old employment. Beginning with a salary of $115 per month, his compensation was increased to $125.

From Kansas City appellee and her husband went to Marshall, Mo., where they remained from August, 1930, until December. There Waters was employed by

[1] In appellant's abstract it is stated the assured was "bill clerk or reporter in the Kansas City main office of a 'line' yard lumber company which had other yards in different states."

[2] Bertha L. Springer was secretary-treasurer of Retail Lumber Yards, Kansas City, for more than 40 years. Waters (the assured) was employed by her in 1908 and was with the company until 1926.

Metropolitan Life Insurance Company, but was transferred to Warrensburg, residing there until August, 1931. Thereafter the couple moved to Fayetteville where the assured operated a filling station for a year.

In August, 1932, the assured was employed by Watkins Produce Company. This connection continued until August, 1933. From December, 1933, until March, 1934, appellee's husband was employed on W. P. A. projects.

May 1, 1934, appellee and her husband purchased a restaurant at Booneville, Mo., and operated it two years. Appellee looked after the business during the day, while her husband managed it at night. He attended to sales, using a cash register; he also made out necessary orders.

When the Booneville business failed, Waters moved with his wife to Windsor, Mo., " . . . and opened another restaurant which [the assured] helped operate and stock."

In August, 1936, the assured returned to Kansas City. Appellee went to Washington county, Arkansas. Friends assisted appellee's husband in procuring a position as bookkeeper in Lawrence, Kansas. Appellee later joined her husband and remained with him until October 15, 1936. Friends again assisted them, and the assured was given a position in a boy scout camp at Osceola, Mo. This employment continued until May 1, 1937.

Appellee first consulted a physician regarding her husband's "nerves." This occurred the latter part of 1937. The assured was not bed-ridden, and until shortly before death was able to attend to his personal affairs, such as dressing, etc. Until shortly before death he conducted his own correspondence, writing ordinary business letters; but, thought the witness, these letters, at times, "were not like other competent people would write." Appellee's husband had $1,400 "employes' stock" in Retail Lumber Yards at Kansas City. Because his business ventures were unprofitable the certificate was sold to meet necessary expenses. Appellee's

summary was that her husband " . . . could carry on a conversation all right, but his mind was not capable of sustained effort."

L. E. Reed had known Waters in 1927 and 1928. This witness conducted a service station and grocery business near Fayetteville. Waters was a customer who bought gasoline and feed. He was "fractious, nervous, and forgettable."

Ernest Crane married appellee's sister. He and appellee's husband jointly purchased the Washington county poultry ranch mentioned by appellee in her testimony. Waters was "quite nervous" in 1926: he was irritated by small things. [Much of the testimony given by this witness was hearsay.]

Mrs. E. D. Crane, appellee's sister, observed transactions incident to the partnership business between her husband and the assured. When she and her sister sold eggs "in town" and bought groceries, " . . . the bill for which they split fifty-fifty, Mr. Waters would get mad and insist that they could not keep books that way. . . ." This witness thought her brother-in-law was having a nervous breakdown, " . . . as he was not able to think things through [and] he let things irritate and disturb him."

Bertha L. Springer (a witness heretofore mentioned) testified by deposition that for many years Waters was "studious, conscientious, quiet, dependable, reliable, and did his work in an acceptable manner." She did not know when the change took place. However, because of unsatisfactory conduct, he was dismissed in 1926. His attitude reflected a nervous condition and irritability. There was the final statement that "he became decidedly incompetent." A change in the assured's "disposition" made it necessary that he be dismissed. On cross examination this witness testified that Waters left in 1926 " . . . for the reason that he had gotten married and wanted to go into the chicken business."

Doctor C. P. Cisco first examined the assured July 17, 1939. The patient complained of abdominal pains

and stated he had suffered from dyspepsia and indigestion for two or three years; also, that he was nauseated at times, and for several months had been unable to work. There were periods when he passed blood from the intestines. Physical examination disclosed that he did not have fever. The chest was normal, but Waters was emaciated. These and other symptoms justified a belief that the patient was afflicted with cancer of the liver "with delusional insanity."

A long hypothetical question was read to Dr. Cisco. With this question as a basis, the doctor was asked whether, in his opinion, the patient's mental condition from the time he lost his position with the lumber company until his death was such that the assured was able to carry on the ordinary affairs of life:— "that is, whether his mind was capable of sustained effort so that he would comprehend such affairs as needed his attention."

The witness answered that, on the assumption statements contained in the question were true and that they constituted an exact history of the case, he would say that the assured had been mentally incapacitated since 1926.[3]

---

[3] "Assuming that insured at age 24 bought a 20-pay-life policy; that the policy provided that on furnishing satisfactory proof of permanent disability, the company would waive payment of premium; that on August 1, 1924, insured's wife was substituted for his mother as beneficiary; that when he bought the insurance, he was employed by a Kansas City Lumber Company as a bill clerk checking daily reports which he continued to do until March, 1926, when he was discharged; that during this period he was studious, quiet, dependable, and conscientious, and later became nervous, irritable, careless, and slighted his work, and his manner made it necessary to discharge him since his mental attitude was different and in his employer's opinion, he had become mentally incompetent; that his employment thereafter, that is, one or two business ventures failed and were financial losses; that thereafter he was nervous, irritable, and quarrelsome with people in business; that he had frequent lapses of memory; was forgetful in conversation and would repeat to the same person; that he wrongfully accused his wife of destroying valuable papers; that he threatened to commit suicide and in December, 1926, his wife discovered him preparing a rope in the barn, apparently to hang himself; that from 1924 until his death, he was afflicted with a severe rectal bloody discharge and would frequently wander out of doors at night complaining that he could not sleep because of nervousness and pain; that from 1926 his physical condition and mental attitude grew worse until his death and that he refused to consult a doctor until shortly before he died on November 6, 1939, as a result of an internal cancer; that he began borrowing on the policy in June,

The question was objected to because it did not state facts as reflected by the evidence. There were other grounds of objection which are not controlling.

By reference to the hypothetical question it will be observed that Dr. Cisco was told the assured was a dependable employe until March, 1926, and that he later became irritable, etc., " . . . and his manner made it necessary to discharge him, since his mental attitude was different, and in his employer's opinion he had become *mentally* incompetent."

The employer's testimony does not contain the statement that the assured was *mentally incompetent*. The witness was asked to explain Waters' personal appearance, his habits, conduct, and his manner when at work. The reply was: "He was studious, quiet, very conscientious, and did his work for years very acceptably."

The next question was: "While Mr. Waters was working for you, did you observe any change in his personal appearance, habits, and conduct, [and in] the character and quality of his work?" Answer: "Yes. He became very nervous and irritable, and not dependable; slighted his work, and made it necessary to replace him. [I] cannot recall just when the change took place."

Describing her observations after the "change" came over Waters, the witness said: "He was careless and his work was such we could not depend on him; and his manner in the office made it hard for office associates." When asked the direct question whether, in her opinion, Waters was mentally competent to carry on his work "at the time you let him go in 1926", the witness answered: "I am positive his mental attitude was altogether different from what it was when he came with the company. Had it not changed, we would

1926, and that in May, 1937, he was advised by the insurance company that unless he paid interest of $43.60 within one month from that date, the policy would be canceled in satisfaction of the loan; that he made no reply to the letter, paid no attention to the matter and did not pay the interest—[on these facts, will you state whether the insured's mental condition from the time he lost his job with the lumber company to the time of his death was such that he was able to carry on the ordinary affairs of life, that is, whether his mind was capable of sustained effort so that he would comprehend such affairs as needed his attention?]"

not have dispensed with his services. . . . However, his *disposition* had so completely changed it was necessary for us to make a change. He had become decidedly incompetent, and not at all as he was when he came with our company.''

While it is true the witness testified that Waters' mental *attitude* had changed, there was the further statement that his *disposition* had "completely changed." She then said that he became "decidedly incompetent." If it be contended that inferentially the witness testified that the assured became mentally incompetent, the fact remains that she did not expressly do so. An involved hypothetical question is ordinarily susceptible of more than one construction; hence, words favorable to the party in whose behalf such question is propounded should not be stronger than those actually employed by the witness whose testimony forms the basis of a particular assertion from which a conclusion of fact is to be drawn.

It is also to be questioned whether net result of the witness Springer's testimony sustains her statement on direct examination that Waters was discharged. On cross examination (in response to the question, "What was the reason Mr. Waters quit your employment in 1926?") she replied: "He had gotten married and he wanted to go into the chicken business."

There is little of value in the testimony of witnesses other than appellee and Dr. Cisco; and, since the doctor was asked an improper question, his reply must be disregarded.

. . . .

Were the circumstances and acts described by appellee sufficient to sustain recovery?

As late as 1933 the assured wrote the company regarding his financial condition and asked time for payment of a small balance. He emphasized insurability, saying: "I am physically fit and can pass a medical examination in fine shape." Of course, a man mentally incompetent could assert his wellbeing, and if in fact insanity then existed, the declaration would not be prejudicial.

But the question is, *Was he* mentally incompetent?

The 1933 letter of April 10 was in response to one written by the company April 7 in which the assured was told there remained, unpaid, interest due December 30, 1932, on the outstanding loan then amounting to $984. There was a request for payment of $49.20. Waters' reply was from Siloam Springs. It is printed in the margin.[4]

May 5, 1937, the company wrote Waters at West Fork (Washington county, Ark.). This registered letter is copied in the footnote.[5] Exhibit "B" to the deposition of Charles H. Cordes, manager of appellant's premium record and loan department, is a return receipt signed "George G. Waters."[6] There was no testimony contradicting the presumption that Waters personally signed the receipt.

[4] "Your K. C. office forwarded me my dividend check in Jan. 1933 on Policy 268178—and which lacked about 549 of paying the interest *a year in advance* after adding on the increased loan value. *I endorsed this dividend check and returned it to them* but lacked the 5.49 and at this time am still lacking it. It is my earnest desire to retain this policy in force and cannot but feel that altho the entire year's interest is not satisfied still a greater part of the year is satisfied. I am hoping that before the proportionate part of the year's value is used up I can start paying on the matter much in the same way that I would start paying on a new policy and in that way the business will still remain on your books under the heading of conserving the business. Please see if you cannot do something for me along this line as I am not in a position to pay the full year's interest and want it as term insurance for that part of the year the increased loan value and div. check will carry it to. If you cannot do this for me, it would compel me to lose the insurance and to have to take out insurance *with some other company* as soon as I was able to do so. I am physically fit and can pass a medical examination in fine shape. I would rather remain a policy holder in your company and with the entire country in such dire straits that the President is asking for and getting wartime emergency authority it would seem to our mutual self interest for you to put as liberal a construction on your terms for the duration of this national emergency as possible."

[5] "There became due and remained unpaid on Dec. 30, 1936 the annual instalment of interest of $54.34 less the dividend of $10.74 on loan of $1086.83 outstanding against Policy No. 268178, issued on your life.

"It will be necessary, therefore, in order to have the policy continued for its face amount of $2,000 that you repay the loan of $1086.83 outstanding against the policy with accrued interest.

"Unless a remittance in repayment of the loan of $1086.83 with accrued interest or a remittance in payment of the loan interest less the dividend or $43.60 is received within one month from the date of this letter, the policy will be canceled in satisfaction of the loan, and there would remain no balance due you.

"Awaiting your early advices in the enclosed envelope for which the company will pay the postage, we remain, . . ."

[6] The assured's full name was George Granison Waters.

It is not seriously contended that the policy accumulated sufficient value to pay loan interest; in fact, the assured recognized this in his letter of 1933. While the status could subsequently change, there is no proof that it did.

A contractual provision is that in case of default in payment of interest, it shall be added to the loan and bear interest at the same rate " . . . unless the total indebtedness . . . shall equal or exceed the total cash surrender value [of the policy], in which case said policy shall become null and void as provided therein."

If in truth the assured became mentally incapacitated while paying premiums—that is, before twenty annual payments had been made—then premiums so collected were not earned and a surplus would have accrued for application to the interest account.

Appellee cites *Griffin* v. *Union Trust Company*, 166 Ark. 347, 266 S. W. 289. This was a will case in which it was held that nonexpert witnesses who for many years have known a testator or testatrix and have thereby had an opportunity to observe conduct, are competent to express opinions in respect of mental capacity. This proposition is not to be questioned.

The case is not controlled by the decisions in *Pfeifer* v. *Missouri State Life Insurance Company*, 174 Ark. 783, 297 S. W. 847, 54 A. L. R. 600; *Old Colony Life Insurance Company* v. *Julian*, 175 Ark. 359, 299 S. W. 366; *Missouri State Life Insurance Company* v. *Holt, Guardian*, 186 Ark. 672, 55 S. W. 2d 788; *Missouri State Life Insurance Company* v. *Case*, 189 Ark. 223, 71 S. W. 2d 199; *Equitable Life Assurance Society* v. *Felton*, 189 Ark. 318, 71 S. W. 2d 1049; or *American United Life Insurance Company* v. *Goodman, Guardian*, 201 Ark. 634, 146 S. W. 2d 907.

These opinions discuss insanity as an excuse for not giving notice of disability, insanity being a form of disability. In the Pfeifer case Chief Justice Hart said that if the assured had become permanently insane at the time disability attached, it could not be expected that proof would be made. It was shown that Pfeifer,

following a gunshot wound, suffered from pellagra, and that his mind was affected. It was held that the requirement that proof of disability be furnished was a condition subsequent. It was also held that there was nothing in the policy " . . . from which it might be said that it was the duty of the beneficiary to give the notice." That is true here. [The Pfeifer case was in chancery.]

In *Old Colony* v. *Julian* it was held that under a policy providing for payments by reason of total and permanent disability due to bodily injuries or disease, recovery is proper where it is shown that the assured became totally and permanently disabled by reason of insanity such as to prevent him from being intrusted with any responsibility. It was remarked that the insanity "amounts almost to imbecility." This was also an equity case.

In *Missouri State Life* v. *Holt* insanity followed an automobile accident, aggravated by Huntington's chorea.[7]

A fact in *Missouri State Life* v. *Case* was that the assured was committed to an asylum for the insane.

In *Equitable Life* v. *Felton* the appellant admitted the assured became totally and permanently disabled within meaning of the contract, and such disability continued from May, 1930, until March, 1933, when death occurred. Again, as in former cases, it was said that giving notice was a condition subsequent.

The opinion in *American United Life* v. *Goodman* contains a statement that appellant's assignment of error based on insufficiency of evidence was the most serious question presented, " . . . and has given us much concern."

In the case before us it is difficult to see how the assured could have been mentally irresponsible from 1926 and during all that time engage in various enterprises. He held positions for as much as two years, merited an increase in salary from $115 to $125 per

---

[7] A nervous disease, especially of children, which is attended with nervous twitchings and other involuntary movements. Also called St. Vitus' dance. Huntington's chorea is a chronic form.

month, wrote an intelligible letter to the insurance company, and mentioned the delinquency existing in 1933. Is this the conduct of one who is insane to such an extent that he could not comprehend transactions relating to the policy?

We have not overlooked Dr. Cisco's testimony—testimony other than that contained in the hypothetical question—to the effect that symptoms disclosed by his examination of Waters justified belief that physical ailments induced delusional insanity. It must be remembered, however, that Dr. Cisco saw the patient only a comparatively short time before death; hence, this part of the testimony was directed to a period timing substantially with the examination.

If it should be conceded that irritability and a failure to sufficiently measure up to an employer's standard of efficiency to retain a position are indications of insanity, the problem not disposed of is the assured's obligation to either pay interest on the loans or permit the policy to be avoided in cancellation. The promise to pay interest in advance was a condition precedent to the assured's right to have the contract continued in force.

The facts most favorable to appellee have been set out at length and this opinion is perhaps unnecessarily extended. A review, however, is attended by the conviction that in spite of the showing that Waters suffered severely from physical ailments, he was not insane within the meaning of our decisions.

Conduct and activities of Waters, his ability to transact business, to go from place to place, to acquire, deal with, and dispose of property—these were physical facts. They are at variance with conclusions drawn by witnesses from incidental transactions and transitory deportment. The rule is that opinion and speculative testimony must yield to physical facts. *Magnolia Petroleum Company* v. *Saunders,* 193 Ark. 1080, 104 S. W. 2d 1062.

The judgment must therefore be reversed and the cause dismissed. It is so ordered.

100

McFADDIN, J., dissenting. I dissent from so much of the holding of the majority as dismisses the plaintiff's cause of action. In my opinion, the cause should be reversed and remanded.

It should be reversed because of the errors in the hypothetical question propounded to Dr. Sisco. Certain material facts were assumed in the hypothetical question which were not shown by any evidence; so the case should be reversed.

But the case should not be dismissed by this court. There was substantial evidence to take the case to the court sitting as a jury. In dismissing the cause, the Supreme Court is, in my opinion, assuming the position of trying and deciding a controverted fact question in a law case.