THE AETNA LIFE INSURANCE COMPANY *v.* MAY.

4-9143                                           229 S. W. 2d 238

Opinion delivered May 1, 1950.

*John M. Lofton, Jr.,* and *Owens, Ehrman & Mc-Haney,* for appellant.

*Bates, Poe & Bates,* for appellee.

Griffin Smith, Chief Justice. Litigants sought answer to the plaintiff's assertion that a life insurance policy had been wrongfully terminated. From a jury's verdict requiring consideration of confusing and inconsistent equations—involving calculations from which one moderately versed in mathematics would retreat, and in respect of which an expert could only state a conditional result—the defending insurer has appealed.

The $2,000 policy on the life of Maurice Marion May was issued November 18, 1926, when he was 18 years of age. He died April 30, 1948. Mrs. Dora E. May, the insured's mother, had on frequent occasions looked after her son's business and claimed to have made some of the premium payments.

On March 18, 1945, the Company mailed Maurice its statement that on the premium anniversary February 18 of that year the unused loan value was $23.44. Applied as a payment on the annual requirement of $41.74, the available loan fund would extend the policy to September 11, 1945. Supplementing this notice, the Company wrote the insured on August 11th, saying the full loan value would be exhausted with use of the small balance previously mentioned, and that $18.30 would be

needed to complete the annual premium payment. It was then stated that this balance, if unpaid after 31 days from the date of notice, would work a forfeiture. The expression was that the policy would "cease". But [said the writer] "We offer any possible assistance to aid you in retaining the benefits of this policy, and will gladly furnish you with any information you may desire".

On September 22d the Company wrote that through failure to pay the premium balance the policy had lapsed. Blanks for use in applying for reinstatement were enclosed. These, said the letter, should be filled out and returned with $18.30. Further word was not received during the insured's lifetime, but on the day of death an interested relative wrote for information. This suit followed the Company's prompt disclaimer of liability.

Witnesses called by the defendant testified that if the 1945 premium had been fully paid when due February 18th the available loan value would have been $744. This does not appear to be contradicted; but appellee insists that the then loan value was $23.44 plus interest overcharges and other items of credit not shown on the statements rendered by the Company and that these were factors not taken into consideration by appellant when the forfeiture was declared. The Company's right to add interest to a borrowed sum is conceded, but it is insisted that with failure to pay this item the interest cannot be added to the capital loan and become a part of the principal for the purpose of charging future interest, for this, says appellee, would be equivalent to paying "interest on interest on interest", contrary to the principle announced in *Vaughan et al.* v. *Kennan,* 38 Ark. 114. For example, appellee concedes that a premium loan of $41.74 was made February 18, 1935, but maintains that the annual interest should have been computed to the policy anniversary (November 18) and set aside as a separate debt of $1.67 for the nine-months period, but that it should not be added to the principal for the purpose of becoming interest-bearing.[1] The Vaughan-Kennan case is dis-

---

[1] When the policy was issued the basis of payment was quarterly premiums of $10.44. The insured later requested that, beginning with February, 1927, the annual basis be established with payments of $41.74. cussed *infra.*

According to the Company's records its first loan was for a part of the premium due February 18, 1933—$30.30. The difference of $11.44 was paid with cash or by check. During the co-called "depression years" small money installments were accepted. These, in some instances, shifted the payment dates; but they did not affect the anniversary.

By April, 1939, according to Company records, loan indebtedness recognized by and acquiesced in by the insured was $213.36, including interest. At that time a consolidated loan was made. By adding the premium of $41.74 due for carrying the risk to February, 1940, the amount was $255.10. The 1941 premium was paid by check.

On March 23, 1942, the insured asked for a loan of $492.57. The application included a request that the premium due February 18 of that year be included and that "previous loan indebtedness with accrued interest thereon" be deducted. The loan was to bear interest at 6%, payable on policy anniversaries, ". . . and I acknowledge said amount, with any interest that may accrue, to be an indebtedness to said Company on account of said policy. . . . When any interest on this loan becomes due and is not paid [it] may be added to and become a part of the principal indebtedness evidenced by this agreement, and subject to the same rate of interest".

The cause of action alleged in the complaint of August 27, 1948, was twofold: (a) the wrongful declaration that loan values were insufficient to maintain the policy beyond September 11, 1945, and (b) the Company's rejection of the insured's offer to pay a premium. The indebtedness was said to have been substantially less than loan values.

It was not charged that the loan of March, 1942, was for an erroneous sum or that the note was fraudulently procured; neither was it contended that its execution was the result of mutual mistake. At trial there was an attempt to prove by Mrs. Dora May (the decedent's mother) that on March 17, 1933, she sent the Company $10.44 to be applied on her son's policy, and that credit

was not given. When asked whether she had searched for the original check, Mrs. May replied: "I haven't looked for a check of any kind. I have just kept a record of most everything, and I let somebody else more competent than I hunt up all of these checks".

The Court then addressed this question to the witness: "In your bank account, Mrs. May (March 17, 1933) it shows an item—that a check was drawn on your account for $10.44. Do you know whether that check was issued to the Aetna Company in payment of the policy of Maurice May? You may answer yes or no, then you give any explantion you see fit". A. "I will say 'yes', but you are not going to get me twisted up". Q. "Do you have any personal recollection of that check" A. "No, sir, I do not". Question by the Court: "Do you know of your own knowledge that *that* payment was sent to Aetna [to apply] on the policy of Maurice Marion May?" A. "You get me right back where you started with me. I know it wasn't paid on mine because I didn't have anything like that".

If it should be held that examination of the account should start back of the 1942 note, the vice of this evidence is that Mrs. May admitted that she knew nothing about the bank entry except that she did not at the time in question make a payment on her own policy; but she *assumed* that the entry stood for a check to the Company. In short, merely because the bank account was charged with an amount equal to a quarterly premium on the son's policy, she was confident the entry stood for such a check, although quarterly payments had not been the custom. Beginning with February, 1927, premiums were on an annual basis. The Company's records showed that in February, 1933, a premium loan of $30.30 was made and that the difference was paid in cash; yet fifteen years later Mrs. May thought the bank's charge "must have been" for the check she did not remember sending for her son.

Illustrating the difficulty encountered in going back of the settlement made by the insured in 1942, attention is called to Mrs. May's contention that a check for $18.76

sent the Company August 22, 1935, was intended as a payment on the son's account. Here, again, the witness did not remember the transaction. Semiannual payments on her own policy were $18.27 until she attained age 60, when they were reduced to $17.67. Due dates were the 23d of January and July with a grace period of 31 days. The payment in question—claimed by the Company to have been made for herself—was within the grace period. But, said Mrs. May, a penciled notation "Maurice" was found in the lower left-hand corner of the check. The witness thought it very likely that when her statement came from the bank she saw the check and at that time marked "Maurice" on it. A question by the Court was: "Very probably the notation was not written at the time the rest of the check was written?", and Mrs. May replied, "It might not have been—I am not positive about that; but I know I wrote it afterwards when it came back. If I had written the same for mine, I wouldn't have forgotten about it in a month's time".

When a question relating to the $10.44 check was again asked, Mrs. May replied: "I won't answer that! I don't know whether I'm answering right or wrong on that". And finally, while being cross-examined, this question was addressed to the witness: "Tell the jury why—when you knew the premium [on your son's policy] had been paid in February, 1935—tell us why you issued a check for $18.76 in August of that year? . . ." The Court overruled an objection by the plaintiff's attorney, and the question was in part repeated:—"Now, tell us why you issued another check in the same year". The response was, "I won't answer that". After other questions had been asked regarding the two checks, Mrs. May made this final declaration: "You just as well quit asking me all those things. I am just not going to answer—*not going to know another thing!*".

One of the questions she declined to answer was whether she had made an effort "to determine from the Company whether it had received those payments—do you know whether it denied receiving them?" [It should be remembered that Mrs. May had testified that she was her son's agent and guardian, and had handled many

of his business transactions, including the insurance matters].

Our conclusion is that the Company, under the plaintiff's pleadings, had a right to rely upon the 1942 loan and recitals in the note that it was a settlement as of that date.

The distinction between rescission and reformation was very clearly stated by Chief Justice McCulloch in *Frazier* v. *State Bank of Decatur*, 101 Ark. 135, 141 S. W. 941. The reformation of a contract [said Judge Mc Culloch] involves an effort to enforce it as reformed, whereas rescission involves an effort to abandon and recede from a contract which the parties did not intend to make. One of the parties to a contract cannot have it reformed on account of mutual mistake, for to do so would be to enforce the reformed contract which the other party had not intended to make. But a different question is presented where one of the parties to a contract seeks to have it rescinded because of a mistake on his part, for that makes only a case of there being no contract between the parties on account of the fact that there had not been a meeting of the minds of the contracting parties. Nor does this violate the rule of evidence which forbids varying or contradicting the terms of a written instrument. The instrument did not become the evidence of the contract between the parties until it was accepted, and if it was accepted by a mistake as to its contents, it constituted a mistake as to the identity of the subject-matter, as much [so] as if it had been the delivery of an article sold and purchased.

Generally speaking, no rule of evidence is violated by admitting parol proof of the consideration for a promissory obligation if the purpose is to show the want of any consideration, or that the consideration failed, or that it was illegal. *Tate* v. *Gould*, 175 Ark. 306, 299 S. W. 24.

In the case at bar the note was given approximately six years before the insured died. No one testified that he had ever questioned its correctness; and in going to trial under allegations of the complaint there was noth-

ing to put the defendant on notice that the note would be questioned. The Company asked that the complaint be made more definite and certain, but the response was that a premium was tendered "about the 18th day of February, 1945, and within the 31 days of grace; . . . and, in addition, there was sufficient loan value to keep the policy alive". There was no effort at trial to establish the alleged tender.

At the conclusion of all the testimony the defendant moved for time within which to procure from the home office records pertaining to the alleged payment of $18.76 in 1935. The Court's attention was called to the absence from the pleadings of any reference to the check, hence its introduction and the claim made as to its application came as a surprise. The Court announced that the evidence was closed, but the jury—without being instructed as to the applicable law—was excused until May 24th, a period of eighteen days. The verdict was for payment of $2,000 less $786, with interest at 6%. An attorney's fee of $300 was assessed.

Since the suit was not of a character informing the defendant that the 1942 note would be questioned, we consider only the transactions subsequent to that time.

First, could the Company add interest to principal at annual rests and thereafter compute interest on the consolidated sums?

In *Guardian Life Insurance Co.* v. *Waters,* 205 Ark. 87, 167 S. W. 2d 886, an insurance contract somewhat similar to the one here was considered. In case of default, interest was to be added to the loan, "and in turn *it* bore interest at the principal rate." We said that the promise to pay interest was a condition precedent to the insured's right to have the contract continued in force.

Mr. Justice EAKIN, *Vaughan* v. *Kennan, supra,* said that ". . . in case of notes bearing contractual interest, when there is no agreement as to the interest after maturity, they can bear interest at the ordinary rate of six per cent. after due. It is a matter of intention to be gathered from the direct expressions, or plain import

of the instrument". Kennan had sued Vaughan and another as joint makers of a note "with interest from date at the rate of 10 per cent. per annum". It was added that "If interest is not paid annually, to become principal and bear the same rate of interest". In construing this language the Court said, first, that it was unusual to speak of *annual* interest on a note running less than nineteen months, for "There would only be one payment, and the whole interest would be payable at the end of another year. Besides, there is no obligation to pay anything before maturity, and nothing could be due to be converted into principal". Therefore, said Judge EAKIN, "The most probable view of the intention of the parties, to be gathered from the language, is," . . . etc.

The holding was that each unpaid sum of annual interest should stand alone, as though a new note had been given for it, bearing like interest. While this construction excluded a charge of interest on interest, the Court's decision was tied to the intention of the parties. It was not a declaration that (while contracting in a non-usurious manner) the parties to an instrument can not declare their own terms, saying what would and what would not be principal.

In some of the earlier cases it was held that interest was allowable on the overdue installments of interest, but not after the maturity of the principal. *Wheaton* v. *Pike*, 9 R. I. 432, 11 Am. Rep. 227.[2]

*Rector* v. *Collins et al.*, 46 Ark. 167, holds that where the maker of a note payable *in futuro*, with 10 percent interest from date, omitting the words "until paid", paid that rate of interest after the note matured, he could not recover the excess over 6% accruing after maturity.

[2] In Doev. Warren 7 Greenl. 48, this interesting statement appears: "Interest is an accessory or incident to principal. The principal is a fixed sum; the accessory is a constantly accruing one. The former is the basis or substratum from which the latter arises, and upon which it rests. It can never by implication of law sustain the double character of principal and accessory. Whatever the plaintiff recovers beyond the face of the notes, the sum originally due, he recovers as interest. No part of it then has yet become principal, nor can it be so regarded. After interest, however, has accrued, the parties may, by settling an account, turn it into principal. It is then in the nature of a new loan; but it does not become principal, by operation of law, merely because it is due."

Judge BATTLE, who wrote the Court's opinion, said: "It was not proved that Collins paid any interest under a mistake of fact, or that he was induced by fraud practiced upon him to do so. He is not entitled to any credit for excessive interest".

In the case at bar the contract was that loans would be made with a pledge of the policy as sole security, with interest at six percent per annum *payable at the end of each policy year,* but if the interest was not paid when due, "it shall be added to the principal and bear interest at the same rate". With payment of the premium for a particular year, *the entire loan value for the end of each policy year* "will be available during the same year". A premium not paid before the end of the grace period would be automatically loaned "and charged as an indebtedness secured by this policy, *subject to interest at the rate of six percent per annum as prescribed* for loans".

We think the effect of the contract—and certainly it is not one prohibited by law or one contrary to public policy under our decisions—was to have unpaid interest added as principal each policy anniversary, with the right to compute interest thereafter as though the added interest were a part of the principal. That is what the parties intended when the contract is given a rational meaning.

With an acknowledged debt of $492.57 and the premium paid to February 18, 1943, the next debit would be six percent on the note, chargeable on the policy anniversary November 18. Since the note was dated March 31, 1942, the interest for 232 days to November 18 of that year would be on the basis of less than 8.1 per day, slightly in excess of the item of $18.72 charged on the policy anniversary. This, added to the note, shows $511.29. Interest chargeable Nov. 18, 1943, would be $30.68; for Nov. 18, 1944, it would be $32.52, and the interest on the debt of $574.49 from Nov. 18, 1944, to Sept. 11, 1945, (297 days) would be slightly in excess of the item of $28.05 actually charged, *reflecting an indebtedness on the note and interest* of $602.54.

Since the premium paid for the 1942-'43 period was included in the March (1942) note, the 1943-'44 premium was credited when an automatic loan of $41.74 was made February 18, 1943. A similar transaction covering the 1944-'45 premium occurred February 18, 1944.

The questions are (a) did the Company correctly compute the policy's cash surrender or loan value, and (b) were these values consumed by the note of March 31, 1942, with interest, plus subsequent premium loans, with interest?

The loan value November 18, 1945, was $730; on November 18, 1944, $678. This testimony is not disputed, and the fact is shown by the policy. A. J. Moody, the Company's Assistant Secretary, testified by deposition that the method for determining the loan value on *February 18* was to ascertain what it was on the preceding anniversary (Nov. 18) "and add thereto one-fourth of the difference between *that* value and the value indicated for the next November 18". The difference between $730 and $678—the increase for a year—is $52. A formulae giving the Company's result (but not disclosed by any tabulation in the record) would be to prorate the increased value to Sept. 11, 1945—the date of cancellation. Dealing with the time from Nov. 18, 1944, to Sept. 11, 1945, there would be this equation: 298 times 52 divided by 365 equals $42.46. Take the loan value on Nov. 18, 1944, and add to it this 298-day prorata, and the value as of Sept. 11, 1945, would be $720.46.

The charges would be as follows: Prorata premium on policy from Feb. 18, 1945, to Sept. 11, 1945,—205 times $41.74 divided by 365 equals $23.44. Automatic premium loans were: Feb. 18, 1943, to Feb. 18, 1944, $41.74; interest from 2/18/43 to 11/18/43, $1.87. Feb. 18, 1944, premium for period ending Feb. 18, 1945, $41.74; interest to 11/18/44, $1.87. Interest on $43.61 ($41.74 plus $1.87) from 11/18/43 to 11/18/44, $2.62. Interest on $46.23 ($41.74 plus $1.87 plus $2.62) from 11/18/44 to 2/18/45, 70c—[1943 loan]. Interest on $43.61 from 11/18/44 to 2/18/45, 66c—[1944 loan]; total of both loans, $91.20. Interest on $89.84 ($91.20 less 70c less 66c) from Feb. 18,

1945, to Sept. 11, 1945, $3.03. Total due Company on automatic loans, both principal and interest, subsequent to March 31, 1942, $94.23.

Recapitulation: Note and interest, $602.54; automatic loans [2/18/43 and 2/18/44] and interest, $94.23; prorata automatic loan, 2/18/45 to 9/11/45, $23.44; interest on $23.44 from 2/18/45 to 9/11/45, 79c. Total charges, $721. Difference between charges and loan value ($721.00 less $720.46), 54c. The Company's computation of charges is shown to have been $720.45, or 55c more favorable to the insured than the results here.

These calculations—based upon testimony not in dispute—do not sustain the appellee's contention that the insurance was wrongfully cancelled. It follows that the judgment must be reversed; and, since the cause has been fully developed in respect of matters in controversy subsequent to the note of March 31, 1942, the cause is dismissed. It is so ordered.