Argued November 23, 1943; affirmed February 8, 1944

# BENNETT *v.* METROPOLITAN LIFE INSURANCE COMPANY

(145 P. (2d) 815)

Before BAILEY, Chief Justice, and ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Robert R. Rankin*, of Portland, for appellant.

*L. A. Recken*, of Portland (Senn & Recken, of Portland, on the brief) for respondent.

ROSSMAN, J. This is an appeal by the defendant, Metropolitan Life Insurance Company, from a judgment entered against it after a trial by jury in an action instituted to recover sums alleged to be due the plaintiff, Allen F. Bennett, upon an insurance policy which the defendant issued June 18, 1920. The plaintiff, an incompetent, appears by his guardian, who was appointed the day this suit was filed. The sums alleged due, and awarded by the attacked judgment, are $900, disability benefits for the period of October 16, 1935, to July 17, 1939, and $146.08, premiums paid in the same interval. An additional sum of $350 was added by the trial judge as compensation for the plaintiff's attorney. The issuance of the policy and the period of disability, as alleged by the plaintiff, are conceded by the defendant. Notice of disability was not given to the defendant until July 17, 1939, and due to that fact the defendant contends that error was committed when judgment was entered against it.

Through the medium of the policy the defendant promised, in consideration of a semi-annual premium of $16.68, payable on the 18th day of June and December, to pay to the plaintiff's widow, upon his death, $1,000. It also agreed, in consideration of a further semi-annual premium of $1.58, that

"* * * if while the above numbered Policy is in full force and effect, and before default in the payment of any premium, the Company receives due proof that the Insured, as the result of injury or disease occurring and originating after the issuance of the Policy, has become totally and permanently disabled so as to be unable at any time to perform any work or engage in any business for compensation or profit, the Company will allow the following benefits:

"(a) Provided said disability occur before the Insured attains sixty years of age, but not otherwise, the Company, commencing with the anniversary of the Policy next following receipt of such proof, will waive payment of each premium becoming due during such disability, and, in addition, commencing six months from the receipt of such proof, will pay each month, during the continuance of such disability, to the Insured, * * * a Monthly Annuity of $10 for each $500 of original insurance under the Policy."

Since the amount of the policy was $1,000, the promised monthly disability payments were, of course, $20. The required premiums were faithfully paid up to and including the one due June 18, 1939.

The answer admits:

"On or about the 16th day of October, 1935, Allen F. Bennett, as insured, suffered a paralytic stroke and as a result of such disease became permanently and totally disabled so as to be unable

at any time to perform any work or engage in any business for compensation or profit.''

In other words, the disability, including its permanent and total character, is conceded. The stroke occurred October 16, 1935. The insured was then 45 years old. July 17, 1939, the defendant received a notice, which it acknowledges was due proof that the insured, as a result of disease, was totally and permanently disabled. September 6, 1939, the defendant commenced making the required payments. The first remittance was for the payment due July 17, 1939. At the same time the defendant returned the premium of $18.26 paid on June 18, 1939. The payments have continued ever since the remittance of September 6, 1939. Nothing, however, has been paid for the period of October 16, 1935, to July 17, 1939.

In this action the plaintiff seeks to recover disability payments for the period beginning October 16, 1935, the date of the paralytic stroke, to and including July 17, 1939, the date from which the first disability payment was calculated. The defendant agrees that if anything is due the plaintiff, the amounts awarded by the judgment are correct; that is, $900 for disability payments, and $146.08 for the return of premiums paid in the disputed period of time.

Two assignments of error are presented. The first states that error was committed

"in not requiring the plaintiff, before permitting recovery, to prove presentation to the insurer of due proof of permanent and total disability within the meaning of the policy as a condition precedent to the defendant's liability."

The second is based on a contention that error was committed

> "in instructing the jury that the presentation to the insurer of due proof of the disability described in the policy could be excused if they found the plaintiff was mentally incapacitated from filing this proof of disability, and that the same was not filed because of the fact of mental incapacity."

The plaintiff concedes that no proof of disability was submitted to the defendant prior to the one aforementioned, that is, the notice received on July 17, 1939. In explanation of the tardiness, the plaintiff's witnesses explained that Mrs. Bennett knew nothing of the provision of the policy which stipulated for the disability payments, and that the effect of the stroke so impaired the plaintiff's mind that he was bereft of all knowledge of the policy.

The plaintiff and his wife (she now being the guardian of his estate) were married in 1918. Two years later the plaintiff, who was then a streetcar conductor, told his wife, according to her testimony,

> "that he had taken out insurance for me today, and when he died that I would have something, and that was all there was to it. It was never explained to me at all. I knew nothing about it. I only knew that he paid on it twice a year; and when he had the stroke I just continued to pay that twice a year."

Thus was the wife advised of the policy which underlies this case. She swore positively that she knew nothing of the disability clause. The policy before us is the only life insurance which the couple possess.

When the policy was delivered to the home it was placed, unread, in a receptacle where the couple kept their valuable papers and remained there, unread, until

June of 1939. In that month the cruel demands of impoverishment drove the wife to the relief office with a request for assistance. There she was asked to bring to the office any insurance policies the family possessed. When she submitted the policy in question there was discovered the clause above quoted. Then the proof of claim, which we have already mentioned, was made, and next came the disability payments beginning July 17, 1939.

When Mrs. Bennett visited the relief office, her husband, as an overseas veteran of the World War, was convalescing in the Veterans Hospital in Portland where he had been for most of the time since October of 1935. The stroke, according to Mrs. Bennett, rendered her husband a helpless invalid.

A couple of years before his stroke Bennett lost his employment with the streetcar system due to the fact that the line upon which he worked was abandoned. A year later the couple moved to a farm. Then in 1935 came the disabling stroke. Bennett was immediately taken to the Veterans Hospital and remained there for six months. In that period, so Mrs. Bennett testified, her husband was entirely helpless and his memory was gone. He could not talk, recognize friends, comprehend his surroundings or transact any affairs. Believing that a return to the farm might be beneficial, the wife brought him home. Bennett remained there for eight months and was then returned to the Veterans Hospital for another stay which lasted for a year and a half or two years. At the conclusion of that stay in the hospital he was again taken to the family home where he remained until January, 1939. In that month he was returned to the hospital and has been there ever since.

.The physician's certificate which formed a part of the notice of claim and which was prepared virtually four years after the stroke, gave the following description of Bennett's condition at that time:

"Hypertensive heart disease. Hemiplegia, right, with seizures sequent. Chr. Interstitial nephritis. Arterial hypertension. Arteriosclerosis, gen.

"Date July 15, 1939.

"Nature Xray and Electrocardiographic findings. Clinical. Electrocardiographic exam. showed over-acting heart, with definite evidence of Myocardial damage suggestive of coronary disease, a stroke which resulted in a hemiplegia 3 years ago."

The ostracism imposed by poverty permits for the home few friends. Nevertheless, sufficient witnesses testified to gain for the record a good impression of Bennett's daily life. Although, prior to the stroke, he was an active man, interested in life, now current events have no appeal for him. He is still unable to recognize old friends that call until their identity has been explained and re-explained to him. Even after the explanation he shortly forgets who they are and the process has to be repeated. He frequently has spells of weeping and every two weeks or so is attacked by what the witnesses termed seizures. They resemble epileptic fits. More than one of the witnesses described Bennett as childish, and his wife said that it was possible to induce him to do anything that one wished. In the periods in which he lived at home after the stroke he was generally found seated inert in the same chair. There he sat in a condition of apathy, unless his frequently repeated question as to when he will get well is indicative of mental activity. When he leaves the chair he needs help in getting about. Seemingly, he experiences a sense of pleasure only when a friend takes him

upon an automobile ride. Since his stroke he has never mentioned the policy of insurance. Control over the movement of his bowels, which was lost when the stroke visited him, has not been regained. When Bennett is confined in the hospital he is in a room with five other patients. The evidence indicates that, although friends of the other patients have learned Bennett's identity and seek to converse with him, he generally confines himself to the salutation "hello." His wife, who has seen him virtually every day in his period of illness, has observed a slight improvement in the last year.

Pursuant to the terms of the policy, the defendant five times requested supplemental proof of Bennett's condition. The requests were made April 19, 1940, November 25, 1940, June 5, 1941, November 21, 1941, and June 8, 1942. They were accompanied with printed interrogatories which were intended to elicit the desired information. The answers were made by physicians in the Veterans Hospital. The pertinent questions and answers follow:

"Q. 12. Is he now able to engage in any work, occupation, or business? A. No. Still hospitalized. See No. 6."

Number 6 of the questionnaire and the reply read as follows:

"6. State in detail the symptoms observed by you at the present time. A. Paralysis and epileptic seizures at intervals."

"Q. 14. Is the insured mentally capable of transacting his personal financial affairs—for instance, the endorsing of checks? A. Yes.

"Q. What is your prognosis? A. Man still hospitalized.

"Q. Give your diagnosis as finally made. A. Hypertension and Nephritis with Hemiplegia, right and convulsive seizures.

"Q. How long will it be necessary for the patient to be under treatment? A. Undetermined."

We are satisfied that the evidence warranted a finding by the jury that, as a result of the stroke, there vanished from Bennett's mind all recollection of the policy of insurance which the defendant had issued to him. Since knowledge of the policy had left him, Bennett, of course, gave no notice to the defendant of the misfortune which had overtaken him and against which the defendant had undertaken to give protection. We are also satisfied that, although Bennett in the period following the stroke could perform such simple tasks as endorsing a check, he lacked the mental capacity requisite for formulating a notice of claim and forwarding it to any one who might have undertaken to indemnify him. Further, the evidence, in our opinion, warranted the jury in finding that Mrs. Bennett and others interested in her husband knew nothing of the disability clause. We believe that the jury was justified in concluding that Bennett's impaired mentality was the reason why no claim of disability was sent to the defendant, either by himself or those interested in him.

In behalf of the plaintiff, it is contended that the requirement of the policy that the defendant should receive due proof of disability "is not a condition precedent to recovery but is only a condition subsequent and that because of physical disability and mental impairment and the incapacity of the insured of knowing or understanding his affairs, he was excused from giving proof or notice of disability until such time as he had recovered his understanding." The defendant (appellant), upon the other hand, says: "The obligation to waive payment of premiums and to pay the permanent and total disability installments is predicated

upon the insured, or someone in his behalf, preparing and delivering due proof of said disability to the insurer as a condition precedent to the liability on the insurance company to make such waiver and payments.''

The defendant follows the statement of that contention by citation to *Bergholm v. Peoria Life Ins. Co.,* 284 U. S. 489, 76 L. Ed. 416, 52 S. Ct. 230, which was an action to recover disability benefits upon a policy issued by that defendant. Premiums were payable quarterly beginning with February 27, 1927, subject to a grace period of one month. The premium due May 27, 1927, was paid, but those due September 27 and in the following quarters were never discharged. The insured died April 18, 1929, and, therefore, the policy lapsed prior to his death; unless it was kept alive by something other than premium payments. The insured became totally and permanently disabled before the premium of September 27, 1927, went into arrears. However, no proof of disability was given to the insurer. The policy provided that ''upon receipt by the company of satisfactory proof that the insured is totally and permanently disabled, as hereinafter defined, the company will'' itself pay the premiums and grant the insured a monthly income for life. The action under review was instituted to recover disability benefits beginning with December 1, 1927, and continuing until the insured's death. The plaintiffs contended that the insured's disability excused the non-payment of the premiums and continued the policy in effect. In rejecting that contention, the decision said:

''Here the obligation of the company does not rest upon the existence of the disability; but it is the receipt by the company of *proof* of the disability which is definitely made a condition precedent to an

assumption by it of payment of the premiums *becoming due after the receipt of such proof.*"

The court held that the plain terms of the policy negatived the plaintiff's contentions and demanded a holding that the policy lapsed with the non-payment of the premium of September 27. In determining whether or not that decision has application to the situation before us, it is well to take note of the following, said in *Mutual Life Ins. Co. v. Johnson,* 293 U. S. 335, 79 L. Ed. 398, 55 S. Ct. 154:

"Bergholm v. Peoria Life Ins. Co., 284 U. S. 489, is not apposite, there being no evidence in that case of incapacity, physical or mental, to give the prescribed notice."

In other words, the insured in the Bergholm case, unlike the one in the case before us, was capable of giving the required notice of his physical disablement.

The plaintiff, in support of his contention above quoted, depends much upon *Johnson v. Mutual Life Ins. Co.,* 70 Fed. (2d) 41, which, upon certiorari, became *Mutual Life Ins. Co. v. Johnson,* supra. The policy in that case was issued in the State of Virginia, and provided:

"If, before attaining the age of sixty years and while no premium on this policy is in default, the insured shall furnish to the company due proof that he is totally and permanently disabled. * * * the company will grant the following benefits during the remaining lifetime of the insured so long as such disability continues: * * *

"(b) Waiver of Premium. The company will also, after receipt of such due proof, waive payment of each premium as it thereafter becomes due during such disability."

The policy granted thirty-one days' grace upon the quarterly premiums. The one due November 16, 1931, remained unpaid December 17, 1931. The company, therefore, claimed that the policy lapsed. The insured died January 20, 1932. By December 14, 1931, he had become disabled within the meaning of the above-quoted clause and the evidence indicated that his mental condition at that time was such that he was incapable of furnishing the required proof. Thus, in that important detail, the case differed from the Bergholm case, in which there was no evidence "of incapacity, physical or mental, to give the prescribed notice." In the Johnson case it was claimed that the insured's mental incapacity excused the failure to furnish the company with proof of disablement. The decision, in sustaining that contention, said:

"The language of the provision here compels the conclusion that proof of disability must be furnished before default as a condition precedent to the waiver of premiums."

Having construed the policy in that manner, the decision continued:

"An overwhelming majority of the state courts that have passed upon the matter have, however, laid down the rule that a condition precedent requiring notice or proof of disability is excused where its performance is impossible by reason of the physical or mental incapacity of the insured, * * *. We think the rule announced by the majority of the state courts is the sound rule to apply. The situation is one where the parties may fairly be said to have contemplated a capacity to make the proof when disability should arise, for otherwise such a contract may prove a trap for the unwary by imposing conditions which incapacity may render it impossible to perform. * * * The evidence of the plaintiff

tended to show mental incapacity to furnish the
proof, as well as total and permanent disability
prior to December 17, 1931, when the period of grace
permitted by the policy expired. Proof of disability
might properly have been furnished at any time
before the end of that period, in compliance with the
requirement that it be furnished 'while no premium
on this policy is in default.' ''

. *Mutual Life Ins. Co. v. Johnson,* supra, was the
same case when it reached the Federal Supreme Court
on a writ of certiorari. That court, after pointing out
that delivery of the policy was made in Virginia, held
that, therefore, the disability provisions of the contract
and their effect were to be interpreted under the laws
of that state. It concluded that, since the law of Vir-
ginia, as declared in *Swann v. Atlantic Life Ins. Co.,*
156 Va. 852, 159 S. E. 192, deemed mental incompetency
a sufficient reason to justify an omission to give notice
of disablement, the policy had not lapsed. It sustained
the Court of Appeals.

Disability payment clauses which condition the in-
surer's liability, upon receipt by it of notice of disable-
ment, are couched in either of two forms. In the first
of these the clause does not state who shall submit the
required proof, and hence it may be furnished by any
interested person. In the Bergholm case the clause
was of that kind. In the second type of clause the policy
states that the proof must be submitted by the insured.
The clause construed in the Johnson case was of that
kind.

Besides stressing the Bergholm decision, the defend-
ant depends much upon *Reingold v. New York Life Ins.
Co.,* 9 Cir., 85 Fed. (2d) 776. The policy construed
in that case was delivered in Oregon to a resident of this
state. The policy's disability clause did not restrict the

furnishing of proof of disability to the insured, but, as the court said, "whether such proof was made by the insured or by someone else was immaterial." A like observation is applicable to the clause in the policy now before us. The decision pointed out that the disability clause in the Johnson case "was conditioned upon proof being furnished by the insured himself." Having noted those distinctions, the court held that the two disability clauses were so dissimilar that the court was not bound by the decision entered by the Circuit Court of Appeals (4 Cir.) in the Johnson case. As we have pointed out, the policy was delivered in Oregon to a resident of this state. That fact, together with the decision in *Mutual Life Ins. Co. v. Johnson,* supra, of course, induced the court to hold that the policy should be interpreted according to the laws of Oregon; but since the law of this state upon such an issue had not been stated, the court felt itself free to determine for itself the applicable rule. It held that the submission of proof of disability, whether by the insured or by someone else, was a condition precedent to the defendant's liability. It found that the condition precedent was expressed in the policy in unambiguous language, and continued:

"We can not rewrite the contract which the parties made, merely because, as it now turns out, one party would have been better off had they made a different contract."

In a dissenting opinion, the late Judge Haney said, in part:

"With regard to provisions in the second class, where it is not specified who is to submit the proof of disability, in Arkansas, Iowa, Kentucky, Nebraska, North Carolina, South Carolina, and Texas, it is held that insanity of the insured excused the

performance of the condition. In addition, Connecticut supports this rule in dicta. On the other hand, the Circuit Court of Appeals for the Fifth Circuit, Alabama, Georgia, Mississippi, Tennessee, Washington, and West Virginia, have held to the contrary, and are supported by dicta in New York.

\* \* \*

"Since Oregon has not yet decided the point, I believe we must adopt the construction which is most favorable to the insured. Stipcich v. Metropolitan Life Insurance Co., 277 U. S. 311, 322, 48 S. Ct. 512, 72 L. Ed. 895. Such a construction requires us to hold for appellant herein, and I therefore dissent."

We shall not pause to review more of the decisions. Many of them are mentioned in the authorities which we have reviewed. More can be found in *Pfeiffer v. Missouri State Life Ins. Co.,* 174 Ark. 783, 297 S. W. 847, 54 A. L. R. 600, and the annotation which appears at page 611 of the volume last mentioned. See also the annotation in 68 A. L. R. 1389. *Mutual Life Ins. Co. v. Johnson,* supra; *Johnson v. Mutual Life Ins. Co.,* supra; *Sherman v. Metropolitan Life Ins. Co.,* 297 Mass. 330, 8 N. E. (2d) 892; and the dissenting opinion of Judge Haney, aforementioned, contain classifications of the decisions. Brief reviews of many of the cases appear in the footnotes to § 1395, Appleman, Insurance Law and Practice. Some of the more recent decisions which embraced the majority view, and therefore held that mental derangement excused failure to furnish proof of the insured's incapacity, are *Magill v. Travelers Ins. Co.,* (1943), 133 Fed. (2d) 709, 134 Fed. (2d) 612; *Schoen v. American National Ins. Co.,* (1943), (Mo. App.), 167 S. W. (2d) 423; *Texas Life Ins. Co. v. Sharp,* (1942), 159 S. W. (2d) 951; *Guardian Life Ins. Co. of America v. Brackett,* (1940), 108 Ind. App. 442,

27 N. E. (2d) 103; *Schlintz v. Equitable Life Assurance Soc.,* (1937), 226 Wis. 255, 276 N. W. 336; *Berry v. Acacia Mutual Life Ins. Ass'n,* (1937), 49 Ariz. 413, 67 P. (2d) 478; *Hickman v. Pan-American Life Ins. Co.,* (1937), 186 La. 997, 173 So. 742; and *Northwestern Mutual Life Ins. Co. v. Carneal,* (1935), 262 Ky. 665, 90 S. W. (2d) 1010. Recent decisions which took the minority view and held that impossibility did not excuse failure to give the insurer notice of disablement are: *Sherman v. Metropolitan Life Ins. Co.,* (1937), 297 Mass. 330, 8 N. E. (2d) 892; *Saul v. New York Life Ins. Co.,* (1937), 92 Fed. (2d) 665; and *Chambers v. Franklin Life Ins. Co.,* (1935), 80 Fed. (2d) 339. The policies in the Magill, Schoen, Sharp, Schlintz and Chambers cases named only the insured as the individual who should submit proof of loss. The policy in the Berry case provided that the insured or his personal representative could make proof of disability. In the Hickman, Carneal, Sherman and Saul cases, the clause did not limit the submission of disability to any specific individual.

This court has never construed the effect of an insurance clause which, as a precursor to disablement payments, requires proof of disability.

*Pfeiffer v. Missouri State Life Ins. Co.,* supra, *Mid-Continent Life Ins. Co. v. Harrison,* 176 Okla. 543, 53 P. (2d) 266, and *American Accident Ins. Co. v. Watson,* 6 Ga. App. 193, 64 S. E. 693, construed the requirement for proof of incapacity as a condition subsequent, and held that omission to give timely notice did not interfere with the insurer's liability. We do not concur in that view, but share in the construction placed upon the clause by all of the other courts which deem the requirement as a condition

precedent; that is, we believe that submission to the insurer of proof of disability, and not the fact of disability, is the condition upon which the insurer's liability is hinged.

The courts which denied recovery, where, due to mental derangement, no proof of disablement was given to the insurer, construed the clause which required proof as a condition precedent which had to be met in all events. All of those courts found that the condition was expressed in non-ambiguous language. They deemed its presence in the policy as proof that the parties, when the contract for insurance was · formed, had in mind impossibility, and that having it in mind they stipulated that upon its occurrence the insurer, nevertheless, should be discharged from its liability unless it received proof of the disablement. In *Sherman v. Metropolitan Life Ins. Co.,* supra, it is held:

> "There is no ambiguity or vagueness. The receipt of due proof of disability is not a mere condition, precedent or subsequent, of recovery, but measures and bounds the insurer's obligation itself. We cannot deny the language its plain meaning without making a new contract for the parties."

The majority courts, with the exception of those which deem the requirement of proof of disablement as a condition subsequent, embrace several lines of reasoning. They say that the requirement for proof is only a modal or procedural matter and that such being its nature, strict obedience to its demands need not be made. Most of them declare that when the parties inserted in the policy the requirement for proof of disablement, they contemplated capacity in the insured to furnish the proof, and did not have in mind impossibility arising through the impairment of his mental

powers. Many of them also employ the principle that impossibility may excuse the performance of a condition in a contract, even though it is a condition precedent, provided (a) the condition is not a material part of the consideration for the other party's performance, and (b) failure to excuse will operate as a forfeiture.

The majority courts frequently cite § 806, Williston on Contracts (Rev. Ed.), from which we quote:

"When courts hold a promisor liable in spite of the non-performance of a condition which the promisor himself has not prevented from happening, they generally purport to reach the results which they achieve by interpretation of the contract, but they are unquestionably doing something more than ascertaining the meaning of the language which the parties use. They are disregarding the condition altogether, in spite of the fact that as matter of English its meaning is perfectly plain, because the particular contingency which has arisen, though the language of the contract is wide enough to include it, was presumably not intended by the parties to be covered. This inference is often drawn where the only reason the court has for supposing that the parties did not have in mind the contingency is that the terms of the contract if literally applied produce a harsh and unreasonable result. * * *"

The 1943 Cumulative Supplement cites as illustrative of that observation the two recent decisions of *Berry v. Acacia Mutual Life Ins. Ass'n,* supra, and *Schlintz. v. Equitable Life Assur. Soc.,* supra. We will shortly glance at those decisions, but before doing so we shall indulge in two more quotations. The following is taken from § 808, Williston on Contracts (Rev. Ed.):

"Where, however, the condition does not form a material part of the exchange for the promisor's

performance, such as conditions which relate to the prompt giving of certain notices or to the timely proof of loss, impossibility caused by the physical or mental incapacity of the person required to give the notice is held by most American courts to excuse the condition whenever necessary to prevent a forfeiture."

Restatement of the Law, Contracts, § 301, states the principle thus:

"Impossibility that would discharge the duty to perform a promise excuses a condition if (a) * * *, or (b) existence or occurrence of the condition is no material part of the exchange for the promisor's performance and the discharge of the promisor will operate as a forfeiture."

Illustration 4 following that statement is:

"A, an insurance company, insures the life of B for the benefit of B's wife, C. The policy contains a condition that default in payment of premiums is excusable if notification is sent by the insured before making default. B becomes insane and makes default in paying a premium. Being insane, he gives no previous notification of the non-payment. Within the period of grace allowed by the terms of the policy if he had sent a notification, he dies. A is bound to pay the policy, the condition being excused because of impossibility."

Let us now turn to the Berry and Schlintz decisions. In the former, the court, after careful analysis of the applicable principles of law, said:

"If insurance companies desire to provide that the illness of an insured or the impossibility of his giving a required notice within the specified time shall not excuse him, they may do so. If they do not explicitly so provide in the policy, we think the better rule is that set forth in Johnson v. Mutual Life Ins. Co., supra."

The Schlintz decision embraced the principle stated by § 808 of Williston on Contracts and § 301 of the Restatement. We quote from it:

"The only duty which Crowell was to perform to put the waiver of the premium payment in operation in the event of his total disability while the policy was fully in force and effect, was to comply with the condition that he furnish the required proof of his disability to the insurer. But as the discharge of that duty was rendered impossible by his mental incompetence, and his furnishing thereof in compliance with that condition was no material part of the consideration to be paid or the things of value to be performed by him in exchange for the insurer's promised performance, and the discharge of the latter would operate, in effect, as a forfeiture, the impossibility of compliance by Crowell with that condition excused his compliance therewith."

■ We believe that when the disability clause of the policy was written both parties contemplated a continuance of Bennett's mental capacity, and that they did not have in mind the contingency which has taken place. In other words, we do not believe that they intended to exact from him the impossible. It is our opinion that the policy does not undertake to say what should be done concerning the furnishing of proof in such an event. We are also satisfied from our examination of the authorities that impossibility, such as that from which the plaintiff suffers, discharges a duty to furnish proof of disablement when the required submission of the proof was not a material part of the consideration, and when insistence upon it would forfeit the rights of the insured. In the present instance, as the quoted paragraph of the defendant's answer states, the insurer is satisfied that the plaintiff, since

October 16, 1935, has been totally and permanently disabled.

The above circumstances in themselves would justify an affirmance of the judgment entered in the circuit court, but there is another matter worthy of mention. As we have seen, the words of the policy which precipitated this controversy were written in 1920. The defendant was their author. The decisions indicate that long before those words were chosen by the defendant several courts, when confronted with similar language, held that impossibility excused the insured from furnishing proof of disability. In all of those instances it appeared that his mental condition had become such through the event insured against that he could not furnish the required proof. It seems reasonable to infer that the defendant must have known of those decisions when it printed the form upon which the policy in question was written. It, therefore, appears that it chose language which had been judicially construed as meaning that the insured would not have to furnish proof of his disability in the event that mental derangement rendered it impossible to furnish proof. Some of the decisions which we have in mind we shall now mention.

In *Insurance Companies v. Boykin*, 12 Wall. 433, 20 L. Ed. 442, a fire insurance policy contained a provision that in case of loss the assured should ''render a particular account of such loss, signed and sworn to by him, and when and where the fire originated.'' Speaking of that provision and of the insured's failure to comply with it, the decision said:

"Second, if he was so insane as to be incapable of making an intelligent statement, this would of itself excuse that condition of the policy."

That decision preceded the writing of the policy in question by half a century of time.

In *Comstock v. Fraternal Accident Ass'n,* 116 Wis. 382, 93 N. W. 22, being an action upon an accident insurance policy, and decided seventeen years before the policy in question was issued, the court said:

"It may safely be admitted that there is some conflict of authority as to whether, under any circumstances in a case like this, liability can survive failure to comply with the requirement as to notice. The overwhelming weight of authority, we may safely say, however, is in favor of plaintiff's position. * * * However, when the contract in question was made, the law was deemed so well settled that, notwithstanding the mandatory language of a policy requiring some act to be done as a condition precedent to the right to recover for a loss, it should be read with an exception saving the rights of the assured from forfeiture for a failure to comply therewith where he is totally incapacitated from acting in the matter, that we hold the parties here entered into the contract in contemplation thereof, and that language to that effect became a part of the instrument the same as if it were plainly embodied therein, though it violates the literal sense of the words used, and regardless of whether it can be, by general rules for judicial construction, found within the reasonable scope of such words."

*Hayes v. Continental Casualty Co.,* 98 Mo. App. 410, 72 S. W. 135, was an action upon a policy of insurance against accident and sickness. The decision was announced in 1903, and in it the court said:

"Defendant contends mainly that the plaintiff was not entitled to recover for the following reasons, viz.: first, because he did not give defendant written notice within ten days after the happening of the accident and make his proof of loss as required

by the terms of the policy; * * * The plaintiff contends, and we think justly, that the foregoing rule does not apply to a case of this kind, for it certainly was not in the contemplation of the parties that if the accident for which the indemnity was provided should render the insured incapable of giving such notice that thereby defendant would escape liability.''

In *Manufacturers' Accident Indemnity Co. v. Fletcher,* 5 Ohio C. C. Rep. 633, 3 Ohio C. D. 308, decided thirty years before the defendant wrote the policy before us, an accident indemnity policy provided:

''In the event of an accident or injury * * * immediate notice shall be given in writing, signed by the member or his attending physician * * * stating the following particulars * * *; and failure to give such immediate notice, mailed within ten days of the happening of such accident, shall invalidate all claim under this certificate.''

Speaking of that clause of the policy, the court said:

''Who should have given the notice—Fletcher or the physician? Evidently Fletcher, or, through his procurance or direction, his physician. The physician had no interest in the policy—may not have known of its existence. * * * If Fletcher was to act or direct within ten days from the accident, he must be in sound condition of mind. * * * So we hold that the condition of Mr. Fletcher's mind within ten days from the date of the accident was such that he was excused from that condition of the policy.''

In that case the insured sustained an injury to his eye which, together with the opiates administered to him, rendered it impossible for him, until two months later, to attend to any business.

In *Guy v. United States Casualty Co.,* 151 N. C. 465, 66 S. E. 437, decided in 1909, a health insurance

policy was before the court which required that "written notice of such disease be given by the insured or his attending physician to the company at its home office within ten days of its contraction." The court, after remarking that "the condition of the patient may be such by reason of his mental condition or violent physical suffering, that he cannot give the notice," held:

"In such cases the rule intimated in Williams v. Casualty Co. (this same defendant) 150 N. C. 598, 64 S. E. 510, is that, where the patient on account of his condition is unable to give notice, he would be excused, if the failure to give notice is without negligence on his part. * * * Of course, the notice to the company may not only be given by the physician, but by any relative or friend acting on behalf of the insured, though their failure to do so when the insured is unable to request it is no bar on the insured."

In *Metropolitan Casualty Ins. Co. v. Johnston,* 159 C. C. A. 283, 247 Fed. 65, 7 A. L. R. 175, the action was on a policy of accident insurance which provided:

"Written notice must be given the company * * * of any accident or injury for which a claim is to be made * * * within 21 days from the date of the accident or injury, unless the giving of such notice within such time shall not be reasonably possible, in which event such notice must be so given as soon as reasonably possible."

The policy provided for weekly indemnities for disabilities payable to the insured, and also for a death indemnity payable to his widow. February 28, 1914, while the policy was in force, the insured sustained an injury to his head. August 30, 1915, he died, but notice was not given to the insurer until September 4, 1915. Notwithstanding the eighteen-month delay, liability

was sustained. The evidence indicated that both the insured's wife and his niece knew of the existence of the policy, but it also indicated that each of them was ignorant of the policy's terms. The court said:

"Clearly, no duty devolved upon the wife to perform an undertaking of her husband to which she was not a party, and of which she was ignorant."

It made the same observation concerning the niece. Further, the decision said:

"The finding of the jury was, in effect, that it was not reasonably possible for the insured to give notice of the accident because of his mental incapacity occasioned by the accident; and that it was not reasonably possible for the wife and niece to give notice for him, because of their ignorance of the requirement until after his death, when the obstacle of their ignorance being removed, notice was given as soon as reasonably possible."

That decision was announced three years before the defendant issued its policy to Bennett.

Several decisions to like effect, all of them rendered before the policy in question was written, may be found in the annotation appearing in 54 A. L. R. 611.

We realize, as our review of the above decisions indicates, that they did not deal with policies of life insurance. Nevertheless a glance at the decisions classified by Mr. Justice Cardozo in *Mutual Life Insurance Co. v. Johnson*, supra, will indicate that he made no distinction upon a basis of the type of insurance policy. He included in his classification cases based upon health and accident policies.

More than one of the decisions aforementioned points out that if the insurer, as a condition precedent to discharge of the disability payments, desires proof of the insured's disablement in those instances in which

the disability has rendered him mentally incapable of making proof, it is a simple matter for the policy to express that demand in words that clearly so state. Although "what'er is well conceived is clearly said," the defendant did not choose to write the required words. Instead it selected phrases, the equivalents of which had been many times construed in favor of the insured in cases where, through mental derangement, he failed to notify the insurer of his disability.

■ We see for the decisions above reviewed that long before this policy was delivered to the plaintiff, disability clauses, notwithstanding their sweeping language, had come to have a meaning different from their literal sense. They had been interpreted in harmony with what the parties obviously had in mind when the policy was written. The courts had refused to accept the words as though they were inflexible and had dealt with them merely as the signs of ideas. In this way disability clauses had come to possess a twofold meaning: (1) their literal meaning, and (2) their courtroom, or obvious, meaning. A cardinal rule of jurisprudence demands that doubts be resolved against the party who used the language capable of a double meaning. That rule should have particular application in an instance like the present.

Thus, even if we did not subscribe to the views that the parties contemplated a continuance of the insured's mental competency, and that a condition precedent will be deemed discharged if (a) it is no material part of the consideration, and (b) insistence upon it will cause a forfeiture, we would hold that since the disability clause is expressed in ambiguous language it must be interpreted in favor of the plaintiff.

■ The above disposes of everything within the assignments of error. However, the defendant argues that the plaintiff should be deemed estopped from claiming that he was mentally disabled. It points to the fact that the physicians in the Veterans Hospital answered "yes" to the inquiry in the Supplemental Proof of the Insured's Condition: "Is the insured mentally capable of transacting his personal financial affairs—for instance, the endorsing of checks?" It is clear that Bennett endorsed the monthly checks which the defendant mailed to him. The defendant's own files could have given the answer to this question, for the checks came back with the plaintiff's endorsement. The endorsed checks are before us as exhibits. Some of the signatures appear to have been written with difficulty. We can not understand how this answer could have misled the defendant. It does not claim that the plaintiff was aware of the answer. But, of course, the part which stated that he could endorse checks was true. Undoubtedly, the general part of the question about the insured's ability to transact "his personal financial affairs" related to simple routine matters like endorsing checks. The answer to that question was by no means the only information which the defendant possessed concerning the plaintiff. The several sets of answered questionnaires which the physicians in the Veterans Hospital sent to the defendant portrayed a man who had spent almost five years in the hospital suffering from illnesses which affect the mind as well as the body. Five years after the stroke the physicians wrote, "Man still hospitalized" in response to the defendant's inquiry, "What is your prognosis?" We find nothing whatever in this contention indicative of merit.

■ The defendant, as already indicated, points out that any interested person could have sent to the defendant the required proof of disability. Some of the courts, in construing disability clauses which required "the insured" to submit proof of disability, pointed out that any interested person could have made the proof. It is evident, however, that no one knew of the disability clause until the plaintiff's wife, in July of 1939, went to the relief office. Rights of which we are unaware have no value. The right to the disability money belonged to the plaintiff, not to someone else. Since there had escaped from the plaintiff's crippled mind all knowledge of the policy and also the ability to look out for himself, it was impossible for him to direct others to send to the defendant the required proof. His rights could not be prejudiced through the failure of others to give the defendant notice; especially not when they knew nothing of the necessity for notice. The instructions told the jury:

> "Others than Bennett could have made due proof of loss, and in order to excuse proof of loss under the conditions of this policy, you must find that proof of loss, whether by Bennett, his wife, or in any other way, was due to and occasioned by the mental incapacity and loss of memory of Bennett himself. As I say, this must be shown before he may excuse failure to make due proof of loss, which concededly and admittedly was not made in this case."

The instructions were as favorable to the defendant as it was entitled to receive.

Finding the assignments of error to be lacking in merit, it follows that the judgment of the circuit court is affirmed.